**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**DAVID BROWN,**

      **Petitioner,**

      **v.**                        **CASE NO.  21-3010-JWL**

**MICHAEL A. JOHNSTON,**
**Colonel,**

      **Respondent.**

**MEMORANDUM AND ORDER**

This matter is a petition for a writ of habeas corpus filed under 28 U.S.C. § 2241.  At the time of filing, Petitioner was confined at the United States Disciplinary Barracks at Fort Leavenworth, Kansas.  Petitioner is currently confined at FCI-Berlin in Berlin, New Hampshire. Petitioner challenges his disciplinary proceeding before the Discipline and Adjustment ("D&A") Board and loss of good conduct time ("GCT").  The Court finds that Petitioner does not allege facts establishing a federal constitutional violation and denies relief.  The Court also denies Petitioner's request for a writ of mandamus.

**I.  Background**

Petitioner is a former active duty member of the United States Army.  Petitioner was sentenced after a general court-martial and at the time of filing was an inmate at the United States Disciplinary Barracks ("USDB") at Fort Leavenworth, Kansas.  On February 10, 2021, Petitioner was transferred to the custody of the Federal Bureau of Prisons ("FBOP") and is currently incarcerated at FCI-Berlin in Berlin, New Hampshire.  (Doc. 12–10.)  Petitioner's maximum release date is January 3, 2026.  (Doc. 12–3; Doc. 1–1, at 30.)

1

On October 27, 2020, a three-member D&A Board found Petitioner guilty, pursuant to his pleas, of having unauthorized contact with a former inmate and making a false statement.[1] (Doc. 13–1, Declaration of Nikki Gessner ("Gessner Decl.")[2] ¶¶ 12–14; Exh. 13, D&A Board Record at 1, 3).  The Board recommended forfeiture of 45 days "abatement to confinement," with fifteen days being suspended for 180 days.[3]  Gessner Decl. ¶ 15; Exh. 13, D&A Board Record at 1.  On October 28, 2020, the Board's recommendation was approved by the USDB Deputy Commandant, and Petitioner lost 30 days of GCT.  Gessner Decl. ¶ 17; Exh. 13, D&A Board Record at 1; (Doc. 12–3, Sentence Computation Report at 2.q.).  Petitioner appealed the Board's decision, and on November 30, 2020, his appeal was denied by the USDB Commandant. (Doc. 13–2, Declaration of Stephen Harms ("Harms Decl.")[4] ¶ 5; Exh. 5, Memo from Colonel Johnston); (Doc. 1–1, at 21).  By regulation, the Commandant is the final authority for appeals of D&A Boards that result in a forfeiture of GCT.  Harms Decl. ¶ 5; (Doc. 12–4, at 16, Manual for the Guidance of Inmates ("MGI"), USDB Reg. 600-1, ¶ 6–4).

Petitioner filed the instant petition under 28 U.S.C. § 2241, raising the following grounds:

(1) "The transcript of the proceedings [is] not accurate and do[es] not allow for any appellate authority to adequately review any appeal."  (Doc. 1–1, at 1.)

(2) "The D&A board president violated [Petitioner's] procedural due process rights by failing to follow the rules outlined in United States Disciplinary Barracks Regulation (USDB) 600-1, Manual for the Guidance of Inmates (MGI)."  *Id.*

---

[1] D&A Boards are administrative hearings conducted inside the USDB to evaluate alleged prisoner violations of institutional rules, and if substantiated, to recommend appropriate discipline.  Gessner Decl. ¶ 3; Exh. 1, Army Reg. 190–47, at ¶ 12–12.a.).  They are empowered to recommend the imposition of administrative disciplinary measures, such as forfeiture of GCT.  *Id.* at ¶¶ 12–4.f., 12–13.d.(1)(f).

[2] The Exhibits to the Gessner Decl. are located at Doc. 12–4.

[3] Abatement to confinement refers to a deduction of days from a prisoner's release date for certain acts or conditions, and includes GCT.  Gessner Decl. ¶ 15; Exh. 14, Department of Defense Instruction ("DoDI") 1325.07 at 90–91; Exh. 1, Army Reg. 190–47 at 85-86.  By regulation, forfeitures are taken from GCT before they are taken from other types of abatements.  *Id.*; Exh. 1, Army Reg. 190–47 ¶ 12–4.f.

[4] The Exhibits to the Harms Decl. are located at Doc. 12–5.

(3) "The board president was not an impartial fact finder." *Id*. at 3.

(4) "The board president did not present a written statement by the finders of fact as to the evidence relied on at the board and the reasons for the disciplinary action." *Id*.

(5) "[Petitioner] was sentenced not based on his case individually." *Id*.

(6) "There is no legitimate penological interest for keeping MAJ Henning from communicating with inmates in prison." *Id*. at 4.

(7) "A 'pending' inmate disciplinary infraction was noted in inmate's parole board file prior to the inmate having the opportunity to appeal, which resulted in a denial of parole." *Id*.

(8) "The Discipline and Adjustment board denied [Petitioner] of the minimum procedural due process rights as set out by the Supreme Court in Wolff v McDonnell and upheld in the Navy Court of Military Review in United States v Hagler." *Id*. at 6.

(9) "There is no evidence in the file to support USDB Reg 600-1 requirement for the preponderance of the evidence or the Supreme Court standard of 'some evidence' as set out by *Superintendent v. Hill*." *Id*.

(10) "The transcripts of the board do not allow for any meaningful appellate review or the review of this Court." *Id*. at 7.

Petitioner asks this Court to:  overturn the D&A Board results; order the prison to remove Major Gessner as Board President; require the USDB to have correctly-summarized transcripts; force the USDB to follow the rules in USDB Reg. 600-1 and all applicable Supreme Court precedents;  restore his forfeited GCT; and expunge his conviction.  (Doc. 1, at 7.)  In his Traverse, Petitioner asks the Court to find a due process violation at his D&A Board and at his 2020 and 2021 parole hearings, and to grant relief by:  overturning the D&A Board result,

ordering removal of the records from Petitioner's prison file, and overturning the ACPB's parole denial for the last two years.  (Doc. 31, at 34.)

## II.  Facts

On July 9, 2020, a USDB parole office employee initiated a prisoner disciplinary report against Petitioner for having unauthorized contact with a former USDB inmate, Mr. Antiwan Henning.[5]  Gessner Decl. ¶ 4; Exh. 4, Prisoner Disciplinary Report at 1.   According to the disciplinary report, Petitioner submitted a copy of his parole packet to the employee two days earlier.  *Id*.  In the packet was a letter signed by Mr. Henning, who the employee knew to be a former USDB inmate.  *Id*.  From the letter, it appeared to the employee that Petitioner and former inmate Mr. Henning had held a telephone conversation consisting of a job interview.  *Id*.  The employee notified his direct supervisor and military police investigators.  *Id*.  That same day, Petitioner was notified that a disciplinary report and investigation was initiated against him for the offense of Unauthorized Contact.  *Id*.  He was also provided with an initial charge sheet for Unauthorized Contact.  Gessner Decl. ¶ 4; Exh. 5, Charge Sheet.

Under USDB Regulation 600-1, Manual for the Guidance of Inmates (Jul. 25, 2016) ("MGI"), "[i]nmates are not permitted to correspond with a . . . former inmate . . . or friend of . . . [a] former inmate, or any other person acting on behalf of . . . [a] former inmate, to include . . . businesses/companies owned/operated by former inmates or persons acting on their behalf in a business partnership without an approved exception to policy."[6]   Gessner Decl. ¶ 5; Exh. 2,

---

[5] A military judge, sitting as a general court-martial, convicted Major Henning, he was sentenced on August 30, 2016, and the convening authority approved the adjudged sentence of dismissal from the service and confinement for thirteen years.  (Doc. 12–6); *see also United States v. Henning*, 2018 WL 2064693, at *1 (Army Ct. Crim. App. Apr. 30, 2018).  Mr. Henning was confined as a prisoner at the USDB until May 8, 2018; he was released after the ACCA set aside his conviction. (Doc. 12–7, Prisoner Release Order); *see also Henning*, 2018 WL 2064693, at *3.

[6] USDB Reg. 600-1 "outlines policies and procedures governing the confinement and compliance with administrative standards set within the USDB, and is promulgated under the authority of the Commandant." Gessner Decl. ¶ 3; Exh. 2, USDB Reg. 600-1 at 1.  The regulation applies to all persons confined at the USDB, and for purposes of the regulation "the term 'prisoner' and 'inmate' are used interchangeably."  *Id*.  "A copy of this

USDB Reg. 600-1 ¶ 2-10.e.  Also, by regulation "[t]he inmate phone system is for contact with family, friends, and/or attorneys[,]" and "[i]nmates are not allowed to add persons such as . . . former inmates, [or] friends/family of current or former inmates . . . ."[7]  Gessner Decl. ¶ 5; Exh. 2, USDB Reg. 600-1 ¶¶ 2–11.b., l.

Likewise, under Army Corrections Command ("ACC") Policy Letter #8, Institutional Offense Policy (Aug. 15, 2017), "[p]risoners are [] prohibited from communicating with, or having contact with . . . former facility prisoners . . . except as authorized in advance through a request by the prisoner concerned to the Facility Commander or designee."[8]  Gessner Decl. ¶ 5; Exh. 3, ACC Policy Letter #8 ¶ 4.bg.

On September 10, 2020, military police investigator Ashley Faircloth was notified of Petitioner's disciplinary report and conducted further investigation.  Gessner Decl. ¶ 6; Exh. 6, Investigator Activity Summary.  According to her report, investigator Faircloth reviewed Petitioner's approved contact list.  *Id.*; Exh. 7, Petitioner Approved Contact List.  Investigator Faircloth also listened to a telephone recording between Petitioner and an individual listed as "Maurice Gomez" on Petitioner's approved contact list.  Exh. 6.  Her investigation revealed that the recipient of that phone call was actually Mr. Henning.  *Id.*

After conducting her initial investigation, investigator Faircloth invited Petitioner to make a statement.  Petitioner agreed, and he was escorted to an interview room.  *Id.*  Investigator

---

regulation is issued to each inmate during in-processing," and "[e]ach inmate is responsible to study and become familiar with [its] content[.]"  *Id.* at ¶ 1–1.b.

[7] USDB Reg. 600-1 counsels that "[n]oncompliance may result in administrative disciplinary action under the [UCMJ], administrative actions before a [D&A] Board, or a combination thereof."  *Id.* at 1.

[8] ACC Policy #8 "lists and describes offenses under which a prisoner may receive administrative discipline."  Gessner Decl. ¶ 3; Exh. 3, ACC Policy Letter #8 ¶ 4.  It cautions that "[f]acility commanders can impose administrative disciplinary measures to ensure compliance with rules and regulations of the facility . . . ."  *Id.* ¶ 2.  Further, it confirms that "[a]ll newly assigned prisoners will be briefed on facility rules and regulations, UCMJ, and administrative disciplinary measures . . ." and that "[a]ll prisoners . . . will be required to become familiar with the rules and procedures outlined in ACC policy, facility rulebook and other guidance provided by the facility commander."  *Id.* ¶¶ 2–3.

Faircloth advised Petitioner of his legal rights.  *Id.*; Exh. 10, Rights Warning Procedure/Waiver Certificate.  Petitioner waived his rights and made a statement.  *Id.*  Petitioner did not dispute that he called Mr. Henning, but claimed that he wasn't aware that he was prohibited from calling Mr. Henning since, according to Petitioner, Mr. Henning was "exonerated of all charges." Exh. 6.  Petitioner confirmed that he was aware of the prohibition against contacting former inmates, but claimed that Mr. Henning was "technically" not a former inmate.  *Id.*

The Investigator Activity Summary provides in part that:

> On 10 September 2020 at approximately 1330, INV Faircloth reviewed the telephone recording (GTL) of the date and time in question.  Please see MPI for further information.

> On 10 September 2020 at approximately 1320, INV Faircloth reviewed the approved contact list on Inmate Brown[']s GTL account.  The Unauthorized Contact telephone call in question shows the name of Maurice Gomez being the recipient of the call. The actual recipient of the call was Antione Henning.  This provides INV Faircloth with reason to believe that Inmate Brown intentionally listed Antione Henning contact information under the name Maurice Gomez because he was aware that contact was unauthorized between himself and Antione Henning.  (A copy has been attached to the case file)

> After review of the case file, it is INV Faircloth's professional opinion that Inmate Brown be titled with Unauthorized Contact (Category III offense) due to the telephone recording proving that Inmate Brown did contact former Inmate Henning, Antione.  It is also INV Faircloth's professional opinion that Inmate Brown be titled with False Statement (Category II Offense) after discovering that he did attempt to hide that he was having contact with Antione Henning.  (A copy has been attached to the case file)

*Id.*

Under ACC Policy Letter #8, an inmate commits a False Statement if he "[s]ign[s], with the intent to deceive, any false record, return, order, regulation or other official document, knowing it to be false, or mak[es] any other false official statement knowing it to be false.  This

includes lying to a staff member about an official matter either verbally or in writing."  Gessner Decl. ¶ 8; Exh. 3, ACC Policy #8 ¶ 4.w.  Under USDB Reg. 600-1, "[t]o obtain permission to make authorized calls, inmates submit an MCC Form 251-1, Inmate Telephone Request through [designated channels], listing the type of phone (home, cellular, or work), the person's name, relationship, complete address, and telephone number to be added to their approved call list." Gessner Decl. ¶ 8; Exh. 2, USDB Reg. 600-1 ¶ 2–11.g.  On July 12, 2018 and October 9, 2018, Petitioner signed and submitted Inmate Telephone Requests to add the name Maurice Gomez/Guzman to his approved contact list.[9]  Gessner Decl. ¶ 8; Exh. 8, Inmate Telephone Request; Exh. 9, Inmate Telephone Request.

On October 20, 2020, the USDB provided Petitioner with written notification that a three-member D&A Board would be convened to adjudicate two charges against him.  Gessner Decl. ¶ 9; Exh. 11, D&A Board Notification.  The Board notification notified Petitioner that he had the right to be present during all open sessions; make a statement and present documentary evidence in his defense; call witnesses to present relevant testimony in his defense; and question adverse witnesses through the Board President.  *Id*.  Petitioner signed the Board notification acknowledging receipt, and did not request any witnesses.  *Id*.

On October 20, 2020, along with the written Board notification, the USDB provided Petitioner with a copy of the charges against him.  Gessner Decl. ¶ 10; Exh. 12, Formal Statement of Charges.  The first charge was for having Unauthorized Contact with a former inmate.  *Id*.  The specification states, in relevant part:

> On 09 July 2020 you were found to be contacting a former Inmate. You are in violation of ACC Policy Letter #8 because . . . [p]risoners are [] prohibited from communicating with, or having contact with . . . former facility prisoners . . . except as authorized

---

[9] Petitioner used a slight variation in his July 12, 2018 inmate request, listing the name Maurice "Guzman" with the same phone number, address, and relationship as Maurice Gomez.

> in advance through a request by the prisoner concerned to the
> Facility Commander or designee.

*Id*.

The second charge was for making a False Statement.  *Id*.  The specification states, in

relevant part:

> You attempted to hide the fact that you were having conversations
> with a former inmate by placing them on you[r] GTL phone list
> under the name Maurice Gomez. You are in violation of ACC
> Policy Letter #8, because False Statement Includes; [sic] signing,
> with the intent to deceive, any false record, return, order,
> regulation or other official document, knowing it to be false, or
> making any other false official statement knowing it to be false.
> This includes lying to a staff member about an official matter,
> either verbally or in writing . . ..”

*Id*.  Petitioner signed the formal statement of charges acknowledging that he read the charges and

received a copy of the same.  *Id*.

That same day, October 20, 2020, Petitioner reviewed the evidence in the case file.

Gessner Decl. ¶ 11; Exhs. 4–10.  That evidence included the following:

> DD Form 2714, Prisoner Disciplinary Report dated July 9, 2020 Exh. 4)
> MCC Form 67-1, Charge Sheet dated July 9, 2020 (Exh. 5)
> DA Form 7569, Investigator Activity Summary dated September 14, 2020 (Exh. 6)
> Petitioner’s Approved Contact List (Exh. 7)
> DA Form 3881, Rights Warning Procedure/Waiver Certificate dated September 10, 2020
>   (Exh. 10)

*Id*.[10]  Petitioner was authorized to take unlimited notes of the evidence.  *Id*.; *see also* Doc. 1–1 at

5 (“[Petitioner] was allowed to review the evidence on or around 21 Oct 20.”).

On October 27, 2020, the three-member D&A Board convened and conducted a hearing

into the charges.  Gessner Decl. ¶ 12; Exh. 13, D&A Board Record.  Petitioner was present for

the hearing; informed of the alleged misconduct; sworn under oath; made aware of his rights;

---

[10] Petitioner disputes that the two MCC Forms 251-1, Inmate Telephone Requests, were in the file prior to his D&A
Board.  Petitioner claims that the Board President left during the Board to retrieve the forms.  *See* Exhs. 8, 9 (MCC
Forms 251-1, Inmate Telephone Requests, dated July 12, 2018 and October 9, 2018).

informed of his right to question relevant witnesses; and given the opportunity to present evidence in his defense.  *Id*. at 2.  The Board President ("BP") and two other Board Members ("BM") were present, along with the Board Recorder, U.S. Navy Yeoman 2 (YN2) Jacob Ohl. *Id*. at 1.  The record contains a summary of the testimony relevant to the Board's findings.  *Id*. at 3–4.

As to the False Statement charge, Petitioner pleaded guilty and admitted to the underlying facts.  Gessner Decl. ¶ 13; Exh. 13, D&A Board Record at 1, 3–4.  He informed the Board that he initially requested to add Mr. Henning to his approved contact list but was denied.  *Id*. at 4. To get around it, Petitioner provided a different name—Maurice Gomez.  *Id*.  Petitioner admitted to seeing Mr. Gomez's name in evidence, recalled putting that information, and explained that Mr. Gomez was Mr. Henning's prior roommate:

[Board Member] BM: You originally submitted Major Henning's number?

[Inmate] IM: No sir. I asked first.

BM: You then changed the name when they said no?

IM: Right. I've seen the name in evidence because I'm assuming it was put on here. That's why I plead guilty.

\* \* \*

[Board President] BP: . . . Who is Maurice Gomez?

IM: That's who [Mr. Henning] was staying with after he left the facility.

BP: So you do recollect putting in that information, if you connected him to his past roommate?

IM: Yes.

*Id*.

As to the Unauthorized Contact charge, Petitioner initially pleaded not guilty. *Id*. He admitted to having contact with Mr. Henning but argued to the Board that Mr. Henning should not be considered a former inmate. *Id*. Petitioner cited to a Department of Defense Directive ("DoDD") 1325.04, and argued that Mr. Henning should be considered a former "detainee" and not a "prisoner" because his conviction was set aside at a later date. *Id*. The Board questioned the sincerity of Petitioner's defense given his apparent knowledge that contacting Mr. Henning was not authorized:

BP: Rights and privileges are different for [Mr. Henning] than they are for you now that he is no longer in the USDB. Thank you for doing you[r] research, it shows you care, especially when you believe you weren't doing the wrong thing as you stated. If you believed you were doing the right thing, why did you give [] an alias in order to call him?

IM: Not that I knew it was wrong, I said he's not a former inmate, he's a detainee. I showed them the paperwork, but they don't care. They said I can't have contact with Major Henning.

BP: But you went back and found a way around it. When you give a different name, you're covering up what you know is wrong.

\* \* \*

BM: The whole inmate detainee stuff; the whole, you falsified a statement to contact Major Henning and proceeded to contact him under a different alias is unauthorized contact. Does that make sense?

IM: I get what you're saying sir, it's just the wording of the charge.

BP: (Reads charge) These two are not the same, but correlate with another.

IM: One, I'm an inmate.  Two, I did communicate with the person.  The way I read the charges and what I'm contesting is that he shouldn't be labeled as a former inmate.

*Id*.

The BP explained that Mr. Henning was still a former inmate regardless of any appeals or re-hearings because he was once an inmate in the facility.  *Id*.  The BP took a recess to consult with the USDB Deputy Command Judge Advocate, Mr. Stephen Harms.  *Id*.  Mr. Harms confirmed that by regulation Mr. Henning was a former inmate and that his current status was irrelevant, which the BP conveyed to Petitioner in open session.  *Id*.  Petitioner then changed his plea to guilty.  *Id*.

## III. Discussion

### 1. Standard of Review

To obtain habeas corpus relief, an inmate must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S. C. § 2241(c)(3).  A federal prisoner has a constitutionally protected liberty interest in his earned GCT.  *Brown v. Smith*, 828 F.2d 1493, 1494 (10th Cir. 1987) (citations omitted).  Therefore, Petitioner is entitled to due process at his disciplinary hearing that resulted in the loss of GCT.  *Howard v. Bureau of Prisons*, 487 F.3d 808, 811 (10th Cir. 2007) (citation omitted).   However, because prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so," the "full panoply of rights due a defendant in [criminal] proceedings does not apply."  *Wolff v. McDonnell*, 418 U.S. 539, 556, 561 (1974); *see also Abdulhaseeb v. Ward*, 173 F. App'x 658, 661 (10th Cir. 2006).

In *Wolff*, the Supreme Court held that in order to satisfy due process in a prison disciplinary proceeding, the inmate must receive: (1) "advance written notice of the claimed violation" no less than 24 hours prior to the hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals;" and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action." *Wolff*, 418 U.S. at 563–66 (citations omitted); *see also Abdulhaseeb*, 173 F. App'x at 661 (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)); *Smith v. Maschner*, 899 F.2d 940, 946 (10th Cir. 1990). Additionally, there must be some evidence to support the decision and the decisionmaker must be impartial. *Gwinn v. Awmiller*, 354 F.3d 1211, 1219 (10th Cir. 2004) (citing *Wolff*, 418 U.S. at 592) (Marshall, J., concurring); *see Diaz v. McGuire*, 154 F. App'x 81, 85 (10th Cir. 2005) (unpublished) (noting that the circumstances of the USDB in the present day are not so materially different than the circumstances of the Supreme Court's decisions in *Wolff* and *Hill* so as to alter the Supreme Court's guidelines regarding the level of process constitutionally required for inmates facing disciplinary proceedings).

## 2. Due Process

### A) Written Statement by the Factfinders

Petitioner alleges a due process violation based on the Board's Discipline and Adjustment Board Record. Petitioner claims that the transcript of the proceedings is inaccurate because: 1) it does not show that the BP left the hearing to collect the two MCC Forms 251-1; 2) it fails to show questions and statements made by Board Members; 3) his pre-typed argument that he made at the Board is not reflected in the transcript; 4) the last line of the transcript is inaccurate; and 5) the sentencing portion of the hearing is not included in the transcript. The last line of the

transcript attributes Petitioner with saying in regard to the definition of a former inmate:  "[h]ad I known the definition of that prior to this, I would've just plead guilty to both so, sorry for taking up your time."  (Doc. 12–4, at 61.)  Petitioner claims that he actually said that if he had known the Board was not going to consider the evidence he presented, he would have just pleaded guilty because the Board was going to find him guilty without the evidence he brought to the Board.[11]  Petitioner claims that the inaccuracies in the transcript would prevent proper appellate review.

Prisoners have a constitutional right to "a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action."  *Wolff*, 418 U.S. at 564 (quotation omitted).  In *Smith v. Maschner*, the Tenth Circuit held that "although the board did not provide a written statement of the evidence supporting the disciplinary action" the written transcript "more than suffices to insure adequate review of the proceedings, to protect the inmate against collateral consequences, and to guarantee that officials, faced with outside scrutiny, will act fairly."  *Smith v. Maschner*, 899 F.2d 940, 946 (10th Cir. 1990) (citations omitted).

The Court finds that the D&A Board Record, including the "Summary of testimony relevant to findings," complies with the requirements in *Wolff* and satisfies the "some evidence" standard.  In *Diaz v. McGuire*, the Tenth Circuit held that the written summaries of the hearings in that case set forth the substance of the testimony heard by the board; noted what evidence the board members found persuasive in reaching their decision; and constituted written records of the disciplinary proceedings.  *Diaz v. McGuire*, 154 F. App'x 81, 85 (10th Cir. 2005) (unpublished).

### B)  Notice

Petitioner argues that he was not afforded proper notice regarding the False Statement

---

[11] The evidence Petitioner appears to be referring to is DoDD 1325.04, which he argued contained the proper definitions for prisoners and detainees.

charge.  Petitioner argues that the charge did not have a date and therefore lacked specificity. Petitioner argues that the BP added the date after the conclusion of the Board and that the date that was added was not supported by the evidence.[12]  Petitioner also argues that the two MCC 251-1 Forms were not in the file when he reviewed it prior to the D&A Board.  Petitioner claims that the BP left the Board to retrieve the forms.

Following deliberations, the BP notified Petitioner of the Board's findings and recommendations, then he was dismissed.  Gessner Decl. ¶ 16; Exh. 13, at 2.  After the Board adjourned, YN2 Ohl completed the remaining administrative information reflected in the D&A Board Record.  *Id*.  In the "Summary of Proceedings" section on page 3, he inadvertently added the date of July 9, 2020, to the False Statement charge.  *Id*.; Exh. 13, at 3.  This was an administrative error, as there was no date contained in the formal statement of charges.  The Board members did not witness or consider that date at any point during the D&A Board process, as the form itself was not prepared or printed until after the Board adjourned.  *Id*.

The Court finds that Petitioner was afforded notice sufficient for him to prepare his defense regarding the False Statement charge.  *See Wilson v. Fikes*, Case No. 21-cv-367 (PAM/HB), 2021 WL 2582259, at *3 (D. Minn. May 18, 2021),  *adopted by* 2021 WL 2582199 (D. Minn. June  23, 2021) (stating that "the Supreme Court has made it clear that due process is satisfied when a petitioner receives advance *notice* of the disciplinary charges against him and a *description* of the evidence to be relied upon" and "[n]othing in *Hill* or *Wolff*, or in any other case this Court has found, suggests that he is entitled to receive copies of the evidence itself in advance of the hearing") (citing *Hill*, 472 U.S. at 454; *Wolff*, 418 U.S. at 564–65).

---

[12] The date of July 9, 2020, was added to the False Statement claim on the D&A Board Record under "Summary of Proceedings."  This is the date that Petitioner's disciplinary report was initiated and is listed as the date for his Unauthorized Contact charge.  However, the dates Petitioner actually signed his two MCC Forms 251-1 are October 9, 2018, and July 12, 2018.

Although the False Statement charge did not contain a date, it did provide data as to the nature of the offense.  The False Statement charge provides that Petitioner "attempted to hide the fact that you were having conversations with a former inmate by placing them on you[r] GTL phone list under the name Maurice Gomez."  The GTL phone list was included in the file that Petitioner reviewed prior to his D&A Board.  (Doc. 12–4, at 46.)  The Investigator Activity Summary was also included in the file and reviewed by Petitioner prior to the D&A Board.  It provided that Investigator Faircloth reviewed Petitioner's approved contact list on Petitioner's GTL account and the Unauthorized Contact telephone call in question shows the name of Maurice Gomez being the recipient of the call while the actual recipient was Mr. Henning. (Doc. 12–4, at 44.)  Petitioner acknowledged during the hearing that he had added that name after he was told that he could not add Mr. Henning to his approved contact list.  Petitioner explained to the Board that Mr. Gomez was Mr. Henning's prior roommate.  Petitioner pleaded guilty to the charge and admitted to the underlying factual basis of the charge.

Petitioner has also failed to show a constitutional violation based on the addition of the date following the D&A Board.  In *Brown v. Rios*,  the Tenth Circuit found no constitutional error where the officer corrected the date of the incident in the DHO's report based on the reporting officer's indication that the date was originally misstated.  *Brown v. Rios*, 196 F. App'x 681, at 684–85 (10th Cir. Sept. 18, 2006) (unpublished).

### C) Failure to Follow Regulations

Petitioner's claims regarding the failure of the Board to follow policies and procedures fail to state a due process violation.  Petitioner claims that the Board failed to follow USDB Reg. 600-1's preponderance of the evidence standard; rejected DoDD 1325.04's definitions for prisoner and detainee; and violated the MGI when it allowed the date to be added to the

specification after the conclusion of the Board.  "[P]rison regulations are meant to guide correctional officials, not to confer rights on inmates." *Farrakhan-Muhammad v. Oliver*, 677 F. App'x 478, 2017 WL 460982, at *1 (10th Cir. Feb. 3, 2017) (unpublished) (citing *Sandin v. Conner*, 515 U.S. 472, 481–82 (1995)); *Cooper v. Jones*, 372 F. App'x 870, 872 (10th Cir. 2010) (unpublished) ("The process due here is measured by the Due Process Clause of the United States Constitution, not the internal policies of the prison.").  Therefore, a failure to strictly follow administrative regulations "does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) (citing *Davis v. Scherer*, 486 U.S. 183, 194 (1984)).

"Where a liberty or property interest has been infringed, the process which is due under the United States Constitution is that measured by the due process clause, not prison regulations." *Brown v. Rios*, 196 F. App'x 681, 683 (10th Cir. 2006) (unpublished) (citations omitted); *see also Sandin*, 515 U.S. at 481–82 (stating that prison regulations are "not designed to confer rights on inmates" and are "designed to guide correctional officials in the administration of a prison").  Thus, even an admitted failure to strictly follow regulations or internal guidelines would not provide a basis for habeas relief absent a showing of a constitutional violation.

### D)  The Right to Call Witnesses

Petitioner claims that the BP paused the proceedings to seek legal advice from Mr. Harms regarding the proper definition of a former inmate.  Petitioner argues that this witness was not under oath, did not personally testify before the Board, and that Petitioner was not allowed to cross-examine him after he provided the legal advice.

"[W]hile an inmate generally has the right to call witnesses and present evidence, such right is not absolute; the prison can restrict witness testimony and documentary evidence due to special requirements of the prison setting." *Diaz v. McGuire*, 154 F. App'x 81, 84 (10th Cir. 2005) (unpublished) (citing *Wolff*, 418 U.S. at 566–67). "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Wolff*, 418 U.S. at 566.

"Confrontation and cross-examination present great hazards to institutional interests." *Id*. at 567. "The Constitution does not require the opportunity for confrontation and cross-examination in disciplinary proceedings." *Diaz*, 154 F. App'x at 84 (citing *Wolff*, 418 U.S. at 568). The scope of a prisoner's right to confront and cross-examine witnesses is similarly committed to the sound discretion of prison officials. *Id*. at 569.

The Board did not abuse its discretion in failing to call Mr. Harms as a witness. The BP took a recess to consult with the USDB Deputy Command Judge Advocate, Mr. Stephen Harms. Mr. Harms confirmed that by regulation, Mr. Henning was a former inmate and that his current status was irrelevant, which the BP conveyed to Petitioner in open session. Mr. Harms was not a fact witness, whose credibility may have had some arguable impact upon Petitioner's guilt. Petitioner was challenging a legal issue. *See Brown v. Wyo. Dep't of Corr. State Penitentiary Warden*, 234 F. App'x 874, 879 (10th Cir. 2007) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony 'would have affected the outcome of this case.'") (citation omitted).

### 3. Some Evidence

Petitioner argues that the Board refused to consider the definitions contained in DoDD 1325.04 that Petitioner argued should be controlling. The Board discussed the correct definition of a former inmate with Petitioner and the BP paused the proceedings to seek legal advice in order to ensure that the charge was legally sufficient. She returned to the proceedings and explained to Petitioner that his definition was wrong as a matter of law, at which point Petitioner pleaded guilty to the charge.

Petitioner also claims that the Board's findings were inadequate because the BP simply wrote that the evidence in the case file led the Board to find Petitioner guilty. The Court has already found that the D&A Board Record, including the "Summary of testimony relevant to findings," complies with the requirements in *Wolff* and satisfies the "some evidence" standard. The Discipline and Adjustment Board Record that was provided to Petitioner in this case contained a "Summary of testimony relevant to findings". (Doc. 12–4, at 60.) The D&A Board Record also provides that the "Board acknowledged the inmate's plea of guilty to the charges of UNATHORIZED CONTACT III and FALSE STATEMENT II." *Id.* "A transcript of the disciplinary proceedings was therefore an adequate substitute for written findings." *Smith*, 899 F.2d at 946.

The Court finds that there was "some evidence" to support the Board's decision. Where the due process requirements of *Wolff* are met, as is the case here, the decision of the Board will be upheld if there is "some evidence" to support the decision. *Hill*, 472 U.S. at 455. "The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Terry v. Jones*, 259 F. App'x 85, 86 (10th Cir. 2007), *cert. denied*, 554 U.S. 924 (2008) (quoting *Hill*, 472 U.S. at 456). A

decision to revoke GTC would only violate due process if the record is "devoid of evidence, providing no support for a disciplinary board's decision." *Id.* (citing *Hill*, 472 U.S. at 457). "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Hill*, 472 U.S. at 457.

"Ascertaining whether [the some evidence] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455–56; *see Mitchell*, 80 F.3d at 1445. "The decision can be upheld even if the evidence supporting the decision is 'meager.'" *Mitchel*, 80 F.3d at 1445 (citing *Hill*, 472 U.S. at 457).

### 4. Impartial Decisionmaker

Petitioner claims that the BP was not an impartial decisionmaker because: 1) she left the proceedings to gather evidence—the two MCC 251-1 forms; 2) she refused to consider Petitioner's definition of former inmate from the DoDD; and 3) she paused the proceeding to obtain testimony from a witness outside of the proceedings, who was not under oath and did not testify before the board, depriving Petitioner of the opportunity for cross-examination. Petitioner claims that the BP participated in the investigation.

"An impartial decisionmaker is a fundamental requirement of due process" and "should be decided on a case-by-case basis." *Gwinn v. Awmiller*, 354 F.3d 1211, 1220 (10th Cir. 2004) (citations omitted). Moreover, "'because honesty and integrity are presumed on the part of a tribunal, there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated.'" *Id.* (quoting *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir.1998)). Instead, a due process violation

occurs only when the facts demonstrate "the risk of unfairness is intolerably high." *Gwinn*, 354 F.3d at 1220 (citation omitted); *see generally Wolff*, 418 U.S. at 592 (Marshall, J., concurring) ("[D]ue process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has any other form of personal involvement in the case.")

Petitioner has not shown a substantial countervailing reason to conclude that the BP was biased with respect to the factual issues being adjudicated or that the risk of unfairness was intolerably high.  The BP was not personally involved with the incidents in the underlying charges, investigation, or any other part of the initial disciplinary process.  Gessner Decl. ¶ 18. The BP only became involved when the matter was referred to her to conduct the D&A Board. *Id*.  After Petitioner presented his definitions from the DoDD, she paused the proceedings to seek legal advice regarding the applicable definition.  Petitioner was not denied any request to question the legal advisor, nor did he seek a continuance of the proceedings.  The BP's questioning during the Board does not reflect any bias with respect to the issues involved.

**5.  Improper Sentence**

Petitioner claims that he was not sentenced based on his case individually, that the BP cited statistics which were not in evidence, and that she considered his prior board history despite the language in a USDB regulation stating each case should be considered individually and on its own merit.  Petitioner has failed to set forth any authority for overturning the D&A Board's recommended sentence, and the Court has previously held that the failure to follow regulations, without more, does not provide a basis for relief.

The Board deliberated on a recommended sentence.  Gessner Decl. ¶ 15; Exh. 2, USDB Reg. 600–1, ¶ 6–3.c.(5) ("Subject to category limitations, three-member boards may recommend

any or all of the administrative disciplinary or management actions."). Violations of institutional offenses are divided into five categories of severity with Category I being the lowest and Category V being the highest. *Id*. at ¶ 6–5.a. The MGI contains the maximum recommended administrative disciplinary and management actions for each category of offenses. *Id*. at ¶ 6–5.b. False Statement is a Category II offense. Gessner Decl. ¶ 15; Exh. 3, ACC Policy Letter #8 ¶ 4.w. Among other things, the MGI authorizes a maximum sentence of forfeiture of 30 days GCT. *Id*.; Exh. 2, USDB Reg. 600–1 ¶ 6–5.b.(2)(a)4. Unauthorized Contact is a Category III offense. *Id*.; Exh. 3, ACC Policy Letter #8, ¶ 4.bg. Among other things, the MGI authorizes a maximum recommended sentence of forfeiture of 90 days GCT. *Id*.; Exh. 2, USDB Reg. 600–1 ¶ 6–5.b.(3)(a)4. The Board in this case recommended a sentence that was well below the maximum sentence authorized by regulation. Petitioner has failed to show that his sentence was improper.

### 6. No Penological Interest

Petitioner also claims that there is no legitimate penological interest in preventing Mr. Henning from communicating with inmates in prison. Petitioner claims that his punishment did nothing to further the institutions rehabilitative goals and did not have a positive effect on Petitioner's misconduct. Petitioner argues that the regulation, *in his particular situation*, has no legitimate penological interest. However, Petitioner does not allege that he attempted to seek an exception to the policy through an advance authorization as permitted under the regulations. Under "ACC" Policy Letter #8, "[p]risoners are [] prohibited from communicating with, or having contact with . . . former facility prisoners . . . except as authorized in advance through a request by the prisoner concerned to the Facility Commander or designee." Gessner Decl. ¶ 5; Exh. 3, ACC Policy Letter #8 ¶ 4.bg.

Petitioner's claim is a First Amendment challenge to the prison rule itself, traditionally brought as a civil rights action.  *See e.g. Turner v. Safley*, 482 U.S. 78, 93 (1987) (finding that a prison rule that prohibited inmate-to-inmate correspondence does not unconstitutionally abridge the First Amendment rights of prison inmates); *see also Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003) (treating the claim under the First Amendment in a civil rights case brought under 42 U.S.C. § 1983, and upholding a prison rule that prohibited inmates from corresponding with former inmates).

Claims challenging a prisoner's conditions of confinement do not arise under Section 2241.  *See McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997) (contrasting suits under Section 2241 and conditions of confinement claims).  To the extent that Petitioner's claim challenges the conditions of his confinement, rather than the duration of his confinement, it is not cognizable in this habeas action under § 2241.  *See Requena v. Roberts*, 552 F. App'x 853, 855 (10th Cir. 2014) (unpublished); *but see Cardoso v. Calbone*, 490 F.3d 1194, 1199 (10th Cir. 2007) (stating that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated" and the "rule also applies to challenges to punishments imposed as a result of prison disciplinary infractions") (quoting *Edwards v. Balisok*, 520 U.S. 641, at 643, 648 (1997)).

### 7.  Denial of Parole

Petitioner takes issue with his "pending" disciplinary infraction being noted in his parole board file prior to him having the opportunity to appeal the Board's decision.  Petitioner's parole

board was conducted the day after the D&A Board's recommendations were approved by the Deputy Commandant, and his file included a note of a "pending disciplinary infraction," which Petitioner contends was the reason the parole board denied his parole.

Respondent contends that Petitioner has not exhausted all available military remedies regarding this claim, and therefore it should be dismissed. (Doc. 12, at 43–44.) "[B]efore seeking collateral review in the civilian system, a military petitioner must exhaust '*all* available military remedies.'" *Banks v. United States*, 431 F. App'x 755, 757 (10th Cir. 2011) (unpublished) (emphasis in original) (quoting *Schlesinger v. Councilman*, 420 U.S. 738, 758 (1975)). "This requires the petitioner to exhaust not just military *court* remedies but *administrative* ones as well." *Id*. (emphasis in original) (citations omitted).

The authority to grant clemency or parole is highly discretionary and is vested in the Service Secretaries, 10 U.S.C. §§ 952(a), 953(1), who are required to establish Clemency and Parole Boards to assist in executing that authority. (Doc. 13–3, Declaration of William S. DeVlaminck ("DeVlaminck Decl.")[13] ¶ 4; Exh.1, Department of Defense Instruction ("DoDI") 1325.07, Encl. 2, ¶ 16.a., d.). The Army Clemency and Parole Board ("ACPB") is the Service-level reviewing authority for the U.S. Army and is empowered by regulation to decide matters relating to clemency and parole. *Id*.; Exh. 2, Army Reg. 15-130 ¶ 2–2.a.–b. The ACPB makes a written parole determination and furnishes a copy to the prisoner. DeVlaminck Decl. ¶ 8; Exh. 2, Army Reg. 15-130 ¶ 4–3.c.(1)–(2)).

A prisoner who is denied parole may submit a written appeal within 60 calendar days of receipt of the written notification of the denial. *Id*.; Exh. 2, Army Reg. 15-130 ¶ 4–4. The facility commander forwards the prisoner's appeal through the ACPB to the Deputy Assistant Secretary of the Army-Review Boards (DASA (RB)). *Id*.; Exh. 2, Army Reg. 15-130 ¶ 4–

---

[13] The Exhibits to the DeVlaminck Decl. are located at Doc. 12–9.

4.a.(3).  With the exception of prisoners serving life sentences, the DASA (RB) takes final action on all parole board appeals.  *Id*.; Exh. 2, Army Reg. 15-130 ¶ 4–4.c.  Once a decision is made, the DASA (RB) furnishes written notice of final action to the prisoner.  *Id*.; Exh. 2, Army Reg. 15-130 ¶ 4–4.d.

On November 3, 2020, the ACPB denied Petitioner's request for clemency, restoration to duty, and parole.  DeVlaminck Decl. ¶ 9; Exh. 6, Department of the Army Memorandum at 1.  On November 6, 2020, Petitioner acknowledged receipt of the ACPB's decision.  *Id*.; Exh. 6, at 2; Exh. 7, Parole Acknowledgement Letter.  Petitioner filed a timely appeal and on February 2, 2021 the USDB transmitted the appeal to the ACPB for routing to the DASA (RB) for final action. *Id*.; Exh. 8, Disposition Board Recommendation at 1.  Among other things, Petitioner appealed the ACPB's decision on the following ground:

> I did not realize that the [disciplinary report] DR for contacting MAJ Henning was included in my parole packet, so I did not get the opportunity to explain the DR to the board. This DR was considered by the board before I even had a D&A Board or the opportunity to appeal. The board is being appealed to the district court.

*Id*.; Exh. 8, at Ground 4.  Petitioner elaborated further in later pages.  *Id*.; Exh. 8, at 3–4.

As of the time Respondent filed the Answer and Return, the DASA (RB) had not taken final action on Petitioner's parole appeal.  Petitioner has not argued otherwise and has not alleged that he exhausted his claim prior to bringing this action.  Thus, Petitioner's claim should be dismissed.

**IV.  Conclusion**

The Court finds that Petitioner was afforded all the due process protections mandated by *Wolff v. McDonnell*.  Petitioner was afforded all three procedural protections mandated by *Wolff*.  He was given advance written notice of the charge by delivery of the Formal Statement of

Charges on October 20, 2020, a week prior to the D&A Board.  Petitioner was advised of his procedural rights before the D&A Board hearing and given the opportunity to present witnesses and documentary evidence in his defense.  Petitioner personally appeared at the hearing and provided a verbal statement.  Petitioner was provided a copy of the Board's Discipline and Adjustment Board Record, which sets forth the evidence relied upon and the reasons for the disciplinary action and sanctions.

The D&A Board met the standards set forth in *Wolff* and *Hill*.  The Court finds that Petitioner received adequate due process at his D&A Board, and the decision is supported by some evidence.  *See Mitchell v. Maynard*, 80 F.3d 1433, 1445 (10th Cir. 1996) (noting that the scope of a court's due process review of a prison disciplinary proceeding is limited to determining whether *Wolff's* requirements are met and there is some evidence to support the decision).

## V.  Request for Writ of Mandamus

Petitioner has filed a request for a writ of mandamus (Doc. 26) asking the Court to order Respondent to deliver to the FBOP all paperwork proving Petitioner's Parole Eligibility Date ("PED") and to conduct his clemency hearings before the next scheduled date on the U.S. Parole Commission's docket.  Petitioner is not claiming that his PED was miscalculated.  (Doc. 26, at 4.)

Petitioner alleges that the FBOP has indicated that he will not be considered for parole until Respondent's staff turn over his parole eligibility paperwork.  Petitioner also believes that Respondent's staff told the U.S. Parole Commission to refrain from conducting a hearing until October.  Petitioner acknowledges that the U.S. Parole Commission has proper jurisdiction over Petitioner's parole, but he believes Respondent's staff is trying to maintain control.  *Id*.

"The Mandamus Act provides, '[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.'" *Rios v. Ziglar*, 398 F.3d 1201, 1206 (10th Cir. 2005) (quoting 28 U.S.C. § 1361). "To be eligible for mandamus relief, the petitioner must establish (1) that he has a clear  right to relief, (2) that the respondent's duty to perform the act in question is plainly defined and peremptory, and (3) that he has no other adequate remedy." *Id*. (citing *Johnson v. Rogers*, 917 F.2d 1283, 1285 (10th Cir. 1990)).  It is Petitioner's burden to show that his "right to issuance of the writ is 'clear and indisputable.'" *Gulfstream Aerospace Corp. v. Mayacamas Corp*., 485 U.S. 271, 289 (1988) (citations omitted).  Even when a Petitioner "meets [his] burden of showing the prerequisites have been met, a court still exercises its own discretion in deciding whether or not to issue the writ." *Marquez-Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995) (citations omitted).  Moreover, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."  *Kerr v. United States District Court*, 426 U.S. 394, 402 (1976) (citations omitted).

Respondent has filed a response, indicating that Respondent has "twice provided FBOP with Petitioner's PED—verbally and in writing—and has also provided such documentation to Petitioner himself."  (Doc. 30, at 4.)  Respondent further states that "by regulation, once Petitioner was transferred to the custody of FBOP, Respondent no longer controls the policies or procedures governing his parole hearings—including the timing of such proceedings."  *Id*.  In sum, Respondent alleges that "Petitioner demands relief that has already been granted, his parole hearings are not Respondent's duty to perform, and he has another adequate remedy—namely, seeking relief from the U.S. Parole Commission who now controls the process."  *Id*.  Respondent also asserts that Petitioner has failed to establish a "clear right to relief" regarding his clemency

hearings because: he has failed to establish that the Army Clemency and Parole Board must conduct his clemency hearing on the exact month that he first becomes eligible; and Respondent fulfilled its regulatory duties. *Id*. at 7–10.

Petitioner has filed a reply, arguing that despite Respondent's assertion that the paperwork has been sent to the FBOP, Petitioner's parole date has not been loaded into the SENTRY system. (Doc. 34, at 1.) Petitioner also asserts that although Respondent claims that he was given his paperwork, Petitioner could not take it with him when he was transferred and did not receive it until two months after he was transferred. Petitioner does not deny that the paperwork was eventually delivered to the FBOP, but rather takes issue with Respondent's delay and failure to address the issue expeditiously. Petitioner claims that Respondent purposefully avoided contact with Petitioner in order to postpone his parole board as much as possible. *Id*. Petitioner claims that Respondent gave the paperwork to the "FBOP Transfer Coordinator" when it should have gone to the Designation and Sentence Computation Center. *Id*. Petitioner also claims that the Respondent gave the FBOP an incorrect final destination regarding Petitioner's transfer, thus failing to ensure that the information was sent to the correct prison. Petitioner claims that he is receiving a delayed Clemency Board because of Respondent's failure to timely perform his duty. Petitioner states that Respondent should ensure that Petitioner's parole eligibility date is properly reflected in the SENTRY system. *Id*.

Petitioner has failed to show he is entitled to an order directing Respondent to deliver his PED paperwork to the FBOP. Although the Court sympathizes with Petitioner's frustration over the delay caused by his transfer and various mistakes that were made, Petitioner does acknowledge that the paperwork was eventually delivered to the FBOP. Petitioner has not

shown that it is Respondent's responsibility to upload the information into the FBOP's SENTRY system.

Petitioner has acknowledged that the U.S. Parole Commission now has proper jurisdiction over his parole. By regulation and agreement, Respondent no longer controls Petitioner's parole hearings once he was transferred to the FBOP on February 9, 2021. (Doc. 30–1, Declaration of Chris J. Moyer, ("Moyer Decl.") ¶ 5 ("Under Army regulation . . . '[p]risoners transferred to Federal facilities fall under the exclusive jurisdiction of the U.S. Parole Commission for parole and supervised release determination . . . As such, Federal and Commission parole policies and procedures apply, not those of [Army] regulation.") (quoting Exh. 2, Army Reg. 15-130, ¶ 3–2.b.(9)); *see also* Exh. 3, MOA, ¶ 4.1 ("Parole approval for military prisoners in custody of the FBOP rests with the U.S. Parole Commission.").[14] This includes the U.S. Parole Commission's rules regarding timing and eligibility for parole. *Id*. Neither the USDB nor the Army has authority to alter or control the U.S. Parole Commission's rules or procedures.[15] *Id*.

Petitioner has failed to show a right to relief regarding his parole hearings before the U.S. Parole Commission. Petitioner has failed to establish a "clear right to relief," or that Respondent's "duty to perform the act in question is plainly defined and peremptory." *Rios*, 398 F.3d at 1206. Here, the duty to perform the act in question—Petitioner's parole hearings—is expressly designated to another agency. By the same token, Petitioner has failed to establish that "he has no other adequate remedy." *Id*. Petitioner's remedy is to address the timing of his parole

---

[14] Petitioner's February 9, 2021 transfer memorandum specifically informed him that "[t]he U.S. Parole Commission (USPC) is the approving authority for Parole . . . for military prisoners in the custody of the FBOP, whether or not [he was] eligible for Parole . . . prior to [his] transfer," and that "[t]he USPC determines the frequency of the consideration and the conditions of release." Moyer Decl. ¶ 9 (quoting Exh. 9 at ¶ 8).

[15] Respondent denies contacting and instructing the U.S. Parole Commission to refrain from conducting Petitioner's parole hearing until October. *Id*. at 4, ¶ 9.

board with the U.S. Parole Commission.  Even if he has (or does) and is denied relief, the proper recourse would be for him to seek further action against the U.S. Parole Commission, not Respondent—who has no authority or duty to perform the act in question.

Petitioner's remaining claim concerns the timing of his clemency boards.  Unlike parole determinations, the Army retains clemency authority over prisoners who are transferred to the FBOP.  Moyer Decl. ¶ 10 ("Clemency petitions for Army prisoners confined in Federal/State correctional facilities will be forwarded with appropriate confinement records and the facility's recommendation to the [Army Clemency and Parole Board] ACPB.") (quoting Exh. 2, Army Reg. 15-130, ¶ 3–1.b.); *see also* Exh. 3, MOA, ¶ 4.1 ("The Secretaries of the respective Services retain clemency authority for military prisoners in FBOP custody.").  The ACPB is the Service-level reviewing authority for the U.S. Army and is empowered by regulation to decide matters relating to clemency and parole.  Moyer Decl. ¶ 4.  Military correctional facilities must provide recommendations to the ACPB concerning an inmate's request for clemency and parole, which is generally done through regulatory disposition boards. *Id*.  By regulation, the ACPB must consider a prisoner for clemency "when the court-martial convening authority has taken action on the sentence, the prisoner's case has been reviewed by a[] [military correctional facility], disposition board, or probation official; and the prisoner meets the eligibility criteria." *Id*. ¶ 10 (quoting Exh.1, Encl. 2, ¶ 17).  For inmates such as Petitioner, whose approved sentence is ten years or more, "initial consideration by the ACPB shall be at least annually, beginning when [he] would otherwise be eligible for parole." *Id*. (quoting Exh. 2, ¶ 3–1.f.(2)).

Petitioner claims that although his PED date is May 3, 2019, his first "local board" was not conducted until July 2019, and his first ACPB board was scheduled for September and conducted in January 2020.  On May 6, 2019, the convening authority approved Petitioner's

adjudged sentence and credited him with nine-hundred ninety-two days of confinement credit. *See* Doc. 12–2, at 2.  The USDB received that action around May 13, 2019.  Moyer Decl. ¶ 11. Based on Petitioner's sentence, after accounting for his confinement credit, his PED was calculated to be May 3, 2019 (10 days prior).  *Id*.  Generally, the USDB must conduct "local disposition boards in time to have the case to the ACPB for a full review at a minimum 30 days prior to his/her parole eligibility date."  *Id*.; Exh. 2, ¶ 4–1.b.(2).  For inmates at the USDB, local disposition boards are conducted approximately two months prior to their PED, in order to accomplish the administrative tasks necessary to forward their board packets to the ACPB.  *Id*.

Respondent argues that due to Petitioner's unique circumstances—his confinement credit placing his PED prior to the convening authority's action—the USDB began his initial disposition board process immediately, which was conducted on July 16, 2019, then forwarded to the ACPB for action.  *Id*.  Respondent argues that while that occurred after Petitioner's initial PED, it was due to circumstances beyond Respondent's control.  However, Petitioner does not question that his *first* parole board was justifiably delayed due to unusual circumstances. (Doc. 34, at 2.)

Petitioner claims that Respondent is at fault for failing to conduct Petitioner's *second* local board two months prior to his PED as required by the regulations, and that Petitioner has been advised by Respondent that because the previous local board was in July, his local boards are now scheduled annually for July.  *Id*.  Petitioner claims that by regulation, his local boards are to be conducted approximately two months prior to his PED, in order to accomplish the administrative tasks necessary to forward the board packets to the ACPB.  *Id*. at 3.  Petitioner claims that the USDB blocked his calls, refused to let Petitioner email them directly, and stated

that if Petitioner continued to send them emails through Petitioner's wife they would tell the warden at FCI-Berlin that Petitioner was harassing them.  *Id.* at 1.

Petitioner states that in order to ensure that this doesn't happen again in the future, he requests an order from the Court directing Respondent to "verify all parole board dates for all military inmates housed in the FBOP, and [to] accept all email correspondence and phone calls from the same." *Id.*  Petitioner also requests that Respondent ensure that all parole and clemency boards at the USDB be conducted before an inmate's parole eligibility date in accordance with Respondent's regulations.  Petitioner requests that the Court grant declaratory relief by stating that Respondent committed perjury in his declaration submitted to the Court.  *Id.* at 3.

Respondent argues that for Petitioner's most recent clemency board action, Respondent began the process of gathering all necessary documents as early as February 18, 2021—over two months prior to Petitioner's PED.  Moyer decl. ¶ 12.  On that date, Respondent sent the FBOP a list of military inmates, including Petitioner, who were eligible for clemency in May 2021, in order to retrieve all documents necessary to process their clemency board packets.  *Id.*; Exh. 10, USDB Clemency Email to FBOP dated Feb. 18, 2021; Exh. 11, FBOP Board Month Search Report, May 2021.  Because Petitioner was recently transferred to the FBOP around that time, Respondent specifically alerted FBOP to this fact and provided Petitioner's inmate roster number, current location, and final destination facility.  *Id.*; Exh. 10.[16]  This is consistent with Respondents practice to conduct local disposition boards for inmates within its facility approximately two months prior to their PED.  *Id.*, ¶ 11.  Respondent argues that this complies with Army regulation, which requires facilities to "conduct the local disposition boards in time to

---

[16] The Court notes that the February 18, 2021 email incorrectly states that Petitioner's assigned facility is FCI Schuykill.  Petitioner was ultimately transferred to FCI-Berlin.

have the case to the ACPB for full review at a minimum 30 days prior to his[] parole eligibility date." *Id*.

Petitioner did not submit his required clemency statement until May 21, 2021—over three months later. *Id*. His clemency packet was then processed through appropriate channels and, on June 23, 2021, was forwarded to the ACPB as required. *Id*. Respondent has stated that moving forward, the USDB "will continue to initiate Petitioner's annual clemency board process in the months prior to his PED, as it did in this case and as it does with all inmates, in order to help it reach the ACPB within the regulatory timeline." *Id*., ¶ 13.

The Court finds that Petitioner has failed to establish a clear right to relief at this time. As it relates to Petitioner's current clemency action, Respondent has submitted the necessary documents to the ACPB, which will conduct Petitioner's board accordingly. Respondent has also stated that the USDB will comply with the regulations going forward.

Although the ACPB is not a party to this action, Petitioner has failed to establish that the ACPB must conduct his clemency hearing on the exact month that he first becomes eligible. Petitioner's PED signifies when his eligibility begins, not when it ends. Petitioner cites no authority that gives him a "clear right" to a clemency hearing ***no later than*** his PED, or reduces the ACPB's broad authority to set specific hearing dates to a "nondiscretionary" duty. The ACPB controls its hearing schedule, which can be delayed for any number of reasons. *See* Moyer Decl. ¶ 13. But, the USDB has done its part by forwarding Petitioner's clemency packet to the ACPB.

Petitioner has failed to meet his burden of proof to show that he is entitled to issuance of a writ of mandamus. Petitioner's request for a writ of mandamus is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the petition for writ of habeas corpus is **denied**.

**IT IS FURTHER ORDERED** that Petitioner's request for a writ of mandamus (Doc. 26) is **denied.**

**IT IS SO ORDERED**.

**Dated September 16, 2021, in Kansas City, Kansas.**

<u>**S/  John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**